Thank you. We are now hearing argument in three cross-peels, which have been consolidated for the purposes of oral argument. Wilkinson v. Facebook, Custodero v. Apple, and Andrews v. Google. And I understand that the appellants, Facebook and Google, are taking 10 minutes each, and that Apple is reserving their 10 minutes for rebuttals. Okay. And Plaintiffs will have 30 minutes. And with that, Mr. Boutros may proceed. Thank you, Your Honor. Yes, we're going to divide up the time. I'm going to go for 10 minutes for Meta, then Mr. Rowley for 10 minutes for Google, and then Mr. Perry is going to be rebuttal for all of us. Thank you. Section 30 in this Court's rich body of decisions applying it bar plaintiffs' claims in this case. This case is about Meta's publication of third-party content from start to finish, which is precisely why Section 230 bars the claims. Counsel, as much as I think you all want a decision in these matters, I'm just wondering if it's premature and it needs to be remanded for a final order. Your Honor, we think this is a classic case for interlocutory review. Judge D'Avola wrote a very thorough opinion but found sui sponte that an interlocutory appeal was warranted because there was reasonable grounds for disagreement among the decisions. The Section 230 here would dispose of the entire case, and we think it bars these claims. And one of the principles of the Court's review is that there is no dispute here as to whether the second Barnes factor has been satisfied for Section 230's application. That's the core legal issue. But, you know, our case law indicates that you really need to look at the claims as well. So you've got to understand what the underlying thesis of the plaintiff's complaint or various claims are as you evaluate the Barnes factors. Correct, Your Honor, but here it's absolutely undisputed that if we look at the complaint, I just pulled a couple pages. Let me ask you this. Hypothetically speaking, if we were to agree with you as to the second theory and the theories one and three, in your view that means the whole case, all the cases, all the claims, everything is gone? Well, we've been the case. Yes, Your Honor. We do think. So here Judge Davila looked at the two different theories. But if you look at the complaint, the theory is that these companies can be held liable for hosting, promoting and collecting money for these third-party content. And I want to make clear, the chips themselves are third-party content. So the entire case, no matter how you slice it, no matter how you dice it, it's all about the fundamental activities that this Court in its decisions has made clear cannot be the subject of a claim because of Section 230. So it's a pure legal issue. There's no dispute about Barnes I.  These are the two theories. What do you think Judge Davila meant by his order that said affirmed in part, no, dismissed in part and not dismissed? I forget exactly how he said it. But he said it struck me as maybe some claims are dismissed in part and some claims are not dismissed. I mean, it's confusing. The way I interpret it, Your Honor, is that he found that two of the theories, hosting and advertising and other, the related activities that the platforms engage in, were barred by Section 230. That applies to all the claims. And then the second prong where he said that the, that we, that he didn't dismiss was this question of the in-app payment processing. And that is exactly what this Court in Dyaroff said is inappropriate, focusing in on a function and saying that that one function is not, is not protected by Section 230. And there in Dyaroff, it was illegal drug transactions. And the plaintiff had pointed to recommendations and notifications that put drug users together. And this Court held, no, Section 230 does not allow this picking through the functions. It's the 10,000 duck bites that the Court talked about in Roommates. So just stepping back, every one of these claims under every State law is focused on the hosting, promotion and collecting of a fee. But don't we need an analysis of what the State law claims actually require proof of, what the basis of the duty is? I mean, how can, I mean, how do we know which claims fall into which theory, which claim? It requires, every single one of the cases requires an analysis of the elements of the State law claim. No, Your Honor. For purposes of this appeal, we are assuming that plaintiffs are correct, that this developer conduct would be illegal under every State law. And we're not, we don't think that's correct, but we're assuming it. And the question is, if it is illegal, can these companies be sued consistent with Section 230? You're painting on a very high brush. I think you're saying that the gambling would be illegal. But we're talking about the claims that plaintiffs have brought against you, the many specific causes of action based on specific State law. Correct, Your Honor. Every single claim, including the RICO claim, and every single claim under every State law, it's all focusing on the same conduct. The hosting of the casino games and the in-app purchasing process for purchasing the virtual chips, which are more content. So it's the dissemination of content, and they're being treated as publishers. Likewise, the chips unlock more content. So what they're attacking, they have different labels, they have different State laws, but every claim is premised on the same content. If you look at pages 30 and 31 of their brief, and then pages 39 and 41, they give away the entire case. In pages 30 and 31, they say chart in-app purchases can be fine under certain circumstances for a subscription, for a newsletter. But here they're focusing on the fact that there's virtual chips for casino gambling, a certain type of content. That's exactly what this Court has said over and over again is protected by Section 230. Let me ask you another question, Mr. Boutrous. Suppose, hypothetically speaking only, suppose we agree with what Judge Davila did. Does that mean the case goes forward on all claims, or would you come back and try and knock out individual claims? It would go forward, Your Honor, on all claims, but the two theories that the Court below found were not viable under Section 230 because they challenged, they treated the companies as publishers would be out of the case. So they would be, the plaintiffs would be limited to arguing that the in-app purchasing component with respect to every State law and RICO, that's the basis of their claim. And, Your Honor, that, this Court has over and over again in Dyroff, in Roommates, in Perfect Ten, which involved online payment processing, has said Section 230 protects the platforms for allowing publication and disseminating information even where there's a fee that they charge and they receive. That's the claim. That's the whole claim here that they're left with. And the judge was entitled under the Federal rules to rule out certain theories. This Court did the same thing, has done that same thing in Kimsey and Barnes and other cases. So the judge said, look, with this activity. Breyer. You know, when you say the district judge had that right, well, in the Rule 16 process, a judge can look at something and try to narrow a case. But it doesn't end up in an appealable order at that point. That's the concern I have. That's, this wouldn't, Your Honor, this wouldn't be an appealable order except that Judge Dabala, who was very thorough, very careful, went through all this Court's cases, said this was a thorny, complex issue. Plaintiffs argue that this Court's decision in Homeaway gives them a victory. It doesn't. It was completely different. It was off-platform. Well, kind of back to my point, though. Yes. What about a right to amend? I mean, we've got multiple claims here, but the right to amend doesn't go away or You know, Your Honor, I think here it would be futile, because the conduct. This complaint, from start to finish, they walked right into a wall of Section 230. It's all about the casino content, the casino games, and the virtual chips. It's like black-letter law in this circuit, and this is the leading circuit on Section 230, that those theories are barred, as is the remaining theory on in-app purchasing payments, and I will leave the rest of my time. Well, I guess I do still have a little time left, but I'll keep going. So on the second theory, why did Judge Davila get it wrong? Judge Davila relied on Homeaway, which is a case that's easily distinguishable. There, the Santa Monica Ordinance, in the words of this Court, and the Court reiterated this in Dyroff, was the ordinance did not require monitoring or analysis of any of the third-party content. It only covered the unlicensed booking transactions that could be in the platforms could check the registry of the Santa Monica City to see whether properties were registered. And this Court emphasized there was no requirement of monitoring the third-party content, even looking at the third-party content, and it wasn't a claim that the third-party content was illegal. Flip side of this case, that's exactly their claim. They claim that the the Which claims? Every single claim, Your Honor. How are we supposed to know without a claim-by-claim analysis? Because, Your Honor, if you look at it, every claim is the same. I think Judge Davila I've looked at the complaint. They're not all the same. They're the same in terms of the core elements of the claims, which are hosting the casino games, allowing the purchase of the virtual chips, dissemination of more content. And that's how to look at it. But those are not the legal obligations at issue in every claim. Every claim that they claim, they're focusing on, would impose a duty of the platforms to monitor, to exclude certain third-party content, or not charge for it. And that's what Section 230 says. Where is that analysis in Judge Davila's opinion? Well, I think he talked, he, the first, when he eliminated the two theories, that's what he was focusing on, that they were focused on the hosting, advertising, other activities. So I think he correctly got that point right, that the claims are fundamentally pinned on this hosting of the casino games and the purchasing of the content. That's all this Court has to focus on. It wipes out the entire case. I think you maybe need to ask. Yes. I don't want to monopolize. May it please the Court. Fred Riley, Jr. for Google. I'd like to pick up on a point that Mr. Boutros made, because I do think that the plaintiffs' claims, and all of the claims, fundamentally do run up against a wall of precedent in this Court and courts nationwide. Really, the plaintiffs' claims end up resting on a distinction about how platforms charge for third-party content that's just irrelevant to Section 230. The plaintiffs don't dispute at this point. On appeal, they concede that offering and hosting the apps, that that's publication. Their answering brief says on page 31, if all the platforms did was put the casino apps up in their app stores, that would be publishing. And the plaintiffs had to make that concession, because the law is clear that when a platform offers someone else's content, and the apps are content here, it's engaged in publishing within the meaning of Section 230. But the law is equally clear in this Court and in courts across the country that platforms don't lose Section 230 immunity by charging money for offering and publishing the apps. Well, they say that the casino, the virtual gambling, I guess you'd want to call it. They say, like, take California, for example. They just say it's illegal. Well, Your Honor, think about dry off, right? Dry off. Dry off involved alleged drug dealing that was taking place on the platform. What Section 230 is concerned about is content and whether what an Internet service provider is doing is publishing someone else's content. And there's no question, but on the plaintiff's own allegations, that's what's happening here. But in HomeAway, the Court said, you know, you can leave those postings up, or the ordinance isn't regulating the content. You just can't process the transaction. Yes, Your Honor. So what if this one of these many State law claims at issue is just saying there's no issue with the publication, they just can't process the in-app purchase? But, Your Honor, these claims are all about content. They're only about content. Content isn't incidental. Content is the entire point. And that's true whether the Court focuses on virtual chips, as the plaintiffs have tried to do on appeal, or whether the Court actually looks at the complaint, because the complaint mounts a broader challenge to the apps themselves. It's content and third-party content either way. So if you focus on the virtual chips, they themselves are content because they're visually depicted and they constitute information. But there's another point in which the virtual chips are content, and this is very important. They unlock the content that is the apps. On the plaintiff's own allegations, the virtual chips are how a user plays the apps. They specifically allege that they are essential to hosting and operation of the social casino games. I would point in the Google complaint to paragraphs 58 to 62. And what they allege is that these chips are essential to play the game. At paragraph 62, they say the purchased chips extend gameplay. So these chips are not just content in and of themselves, but they're content because they are bound up with the apps, which are also third-party content. So what does the plaintiff's claim, what do all the claims end up resting on? They rest on this distinction between how the social casino apps allegedly charge for access to the games and how other platforms might do it. The plaintiffs don't dispute. They actually concede that there are at least some ways for social casino apps to charge users to access the apps that would constitute publishing. They actually say that, and I'll quote here from page 31 of their answering brief, they say that an app could, I'll try to find the quotation here, they say that the app, this is at page 31, offering a subscription or selling a newspaper is quintessentially publishing conduct. And so it wouldn't matter if a newspaper were charging for individual newspapers. It wouldn't matter if a newspaper were charging for subscriptions. What would matter is it's publishing because they're still publishing content. And the same is absolutely true of the social casino apps. How do we know? Because on page 31 of the brief, they acknowledge putting up an advertisement for a social casino website, even if there were a charge to do so, that's publication. And so they're saying, well, if you use an advertising model, that's publication. But because these social casino apps charge on a pay-to-play basis, they charge for in-app content, that's somehow not publication. That distinction is just irrelevant. I understand your argument is that literally every single claim raised in this complaint rests on these issues. Yes. How — where is that analysis in the district court's order? Well, Your Honor, the district court exercised its broad discretion to sequence the issues that were — that would be presented by the party's motion to dismiss. And as a lot of courts do, the district court had the 230 issues briefed first before the merits issues. So we have case law saying that we cannot issue an advisory opinion, and this procedure for interlocutory appeal isn't meant to essentially certify legal questions to this Court. So why isn't this appeal barred by that doctrine? Your Honor, I think that — that the district court properly acknowledged and properly recognized that this is a controlling issue of law, and it is Heartland 1292B — Heartland 1292B situation, because if this Court reverses on the second theory, the payment processing theory, if it reverses on that, the case is over. And so — and so I think that this is exactly the kind of situation where a district court properly considers Section 1292B review, and I think it is significant that Judge Davila sua sponte undertook the 1292B analysis and certified — and certified the issues. Yes, Judge Pius. Mr. Wright, let me ask you this. When Judge Davila gets around to applying his theories, he goes through the cases, and then he gets to application to the — of the theories to the complaint. And he's talking about his second theory on page 33. Yes, Your Honor. And he says — he references Gonzales in Home Away. Yep. And then he says, likewise here, plaintiffs seek to impose liability for the platform's processing of unlawful transactions for unlawful gambling. That was the reference to bookie-type — Yes. — kind of activity. What's wrong with that? Your Honor, what's wrong with it is that the only transactions that are being challenged here are for content. The virtual chips are content. The apps themselves are content. We are not talking about off-platform, off-Internet things, as in Home Away, which involve transactions. When you talk about content, you're talking about within the apps. Yes, Your Honor. The apps, but also the virtual chips. All of it is content. Well, the chips only occur within the app. Is that correct? Yes, Your Honor. But they are — they're bound up with the app itself, which is content, because the plaintiffs allege that the chips are essential to play the app. But even if you take the chips on their own, just — if you just segregate them out, they're still content. They're information within the meaning of Section 230. They tell the player what the resources they have, the resources that are available to play the game. So any way you cut it, whether you start the analysis with the app or whether, as the plaintiffs do on appeal, you focus on the virtual currency, you end up in the — or the virtual chips, you end up in the same place. And so I think that's where Judge Davila kind of lost the analysis or lost its way in that the court treated the payments as though they were almost for gambling in real life when they're only for content. The content isn't incidental. The content is the whole point. And that makes the case fundamentally different from both HomeAway and Gonzalez, which at the end of the day involve payments or transactions off-platform and off the Internet. But there's another point, and this is very important, and that is that HomeAway, in that case, the website could comply with the Santa Monica City Ordinance without having to engage in monitoring and monitor the content. And here, the monitoring would be quite extensive. You would not only have to monitor whether the micropayments — and that's what these are. These are payments sometimes in dollars and cents. You'd have to monitor the micropayments not only for specific social casino apps. You'd have to find those social casino apps. But the plaintiffs allege that not all the games within the app are illegal. And so you'd have to, in addition to segregating out or culling the social casino apps, you'd have to find the micropayments for specific games within the app. And we're talking about millions of players and millions of transactions. That's exactly the kind of editorial judgments, parsing things, that Congress was concerned about in Section 230. So we submit that the district court got that part of his analysis wrong and that that theory, the payment processing theory has to be — the analysis of that has to be reversed. Okay. Good morning. May it please the Court. You know, in their briefs in an argument today, Apple — you know, Google and Meta and Apple in their briefs have made very clear they've got a policy preference for light regulation on what they do. And it's a fine view to have, but I'm really struggling to figure out what it has to do with this case or with Section 230. I mean, what we're doing here is interpreting a statute, 47 U.S.C. 230 C.1. And we heard a lot today about content over and over again, that the chips are content, that the apps are content. But this Court has repeatedly explained that it's not enough — and this is an exact quote from Homaway — it is not enough that third-party content is involved. Internet brands rejected use of a but-for test that would provide immunity under the CDA just because third-party content is involved. That last part is not part of the quote. And so I'm really struggling here to figure out what the argument is beyond, well, third-party content is involved. Therefore, CDA 230 must be involved. That was the reasoning that this Court rejected in the Roommates.com on block opinion and hasn't adopted since. The question we're trying to answer here is whether we have pleaded ourselves out of court by setting out a case that necessarily seeks to hold these defendants liable for publishing conduct, that is, publishing of third-party content. And I haven't heard today any reason why we can transform what is fundamentally gambling activity, that is, brokering transactions for gambling, into something that a publisher does. In Barnes, the Court explained that we're not going to do intellectual gymnastics to figure out what is and what isn't publishing. We know what publishing is, and it's not running a casino. Counsel, would you then be conceding your opposing counsel's position that amendment would be futile? In other words, if you pleaded yourself out of court, is there a way you could plead a claim that would be viable? Assume we accept the position that 230 defeats your current claims. Would you be able to amend to plead a plausible claim? I understand the question. Okay. So, you know, if you accept the premise that brokering a gambling transaction is publishing, which is, you know, I think what is in dispute and what we disagree with here, then the question would be, okay, well, then can we plead enough to demonstrate that the content being published is not, in fact, third-party content, but is content that we can attribute to the defendants here? And that would be Judge d'Avila found that we didn't plead enough in our complaint to get there. But that doesn't mean that we can't, and it doesn't mean that we shouldn't have another opportunity to do so. And that's, in fact, the reason for our cross-appeal here. You know, we didn't see the need to appeal whether or not our complaint sufficiently set out that theory, because our understanding of what a district court is doing when it dismisses a theory on a motion to dismiss, which I think probably under Rule 8 you're not really supposed to do. But we understand what that means. We understand that means I'm not going to let you take discovery on this. And that's fine. We understand district courts, he could have done it with a discovery order, and it's not really a problem unless, as Your Honor pointed out previously, there's an interlocutory appeal. And then we end up with a law of the case problem, right? And we're back potentially in the district court trying to figure out, okay, what did the Ninth Circuit intend to allow to go forward and whatnot? And so I guess, however — So let me ask you this. If he hadn't certified this case under 1292B, and the case were to go forward, would any claims be out? I don't think so, no. I think the argument — Well, you didn't say — well, you don't know. The argument the defendants made was not that any particular claim — you know, the way that they decided to move to dismiss was not that any particular claim didn't meet the, you know, the standard, but that we had, you know, fully set out the affirmative defense. And so at this point, no, the defendants didn't argue for the dismissal of any particular claim. So if we would agree with Judge Davila, all claims just go forward? Well, the way that Judge Davila had set up the case management, my expectation would be that there would be another round of briefing on the pleadings that would address the state-by-state questions. And so they would — I don't know that they would all go forward. What would those motions to dismiss look like? Well, I suppose it would be up to defendants if they wanted to file them. Well, you must have thought about it. Sure. What I would expect to see is that, you know, different — you know, obviously these cases are under different States' laws, you know, some of which have more interpretation than others, some of which State supreme courts have ruled upon. And so I would certainly expect to see arguments specific to the statute saying, you know, what you have alleged does or does not meet a particular State statute. So, for example, I think in Washington, the question is relatively clear, right? This Court has held that, you know, the type of game and, in fact, some of the exact games alleged here are gambling. So I think that's — that may be the end of that in terms of — in terms of Washington, but there may be other States where the law is less developed or whether it's less clear, and they may — they may have arguments on that front. Do you think we should require Judge d'Avila to be more specific? I don't — I don't think that that's — I think that this problem is created by allowing an interlocutory appeal that is effectively just seeking to apply the settled law of this Court to the facts of a particular case. If this were an ordinary appeal after a final judgment, we wouldn't have that problem because the questions that Your Honor is asking would have been answered already. You know, 1292b is really designed to get at these, you know, the Seventh Circuit called them pure questions of law, right, things that can be answered a little bit more in the abstract and that are new questions on which there can be disagreement. And Judge d'Avila, if I think correctly, didn't really identify such room for disagreement on the pure questions of law here. This Court has set out in recent years a pretty — pretty clear framework on Section 230 and on how we go about figuring out, you know, a three-part test that's grounded pretty closely in the language of 230c1. And the question here is really, is gambling publishing? And the answer is no. But even if, you know, somebody could, you know, come to a different conclusion while they've done — Let me just — I have one last question along this line. Suppose we would agree with the defendant's appellants. Does that end your case completely? That 230 — that Judge d'Avila got it wrong on the second theory and they're right and 230 applies? Does that — is your case gone? No, I don't think so, Your Honor. The — you know, this Court's — Then what's left? Well, this Court's precedent is quite clear that ordinarily plaintiffs should be granted at least one opportunity to amend their complaint unless it would be futile to do so. And we haven't — this is on amended complaints. This was our first chance at it. And, you know, if the answer is, well, this is publishing, well, then yes, we should have the opportunity to add additional allegations to rise to the level of plausibility that, you know, that this is in fact the defendant's content and not third-party content that they can be held liable for because of their close relationship with these games. Now, the district court found that we could go forward on the transaction theory without having to do that. And, you know, there was no reason for us to appeal that particular determination here because, you know, we — under Rule 8, we only need to have one viable legal theory. And the district court found that we had one. But if, as Your Honor says, the Court disagrees, then we should at least get another chance to make the allegations that are required under whatever new standard is set out. But I would say that it would be a pretty big departure from the way that this Court has approached Section 230 in recent years. And I think the HomeAway case is directly on point here. You know, the only distinction I heard was that, well, that has to do with real-life bookings. But HomeAway didn't turn on that question. Well, did the panel in HomeAway also say that that procedure could function without the website? It just didn't really require. And the same is true here. So, you know, the defendants here, they like to bundle together their hosting of the apps and the payment processing because it is a very lucrative thing to do. Thirty percent. Yeah. It's a lot of money. And I will say microtransactions have added up — we've got affidavits attached to our complaints here — hundreds of thousands of dollars. So micro or not, we're talking big money. But in terms of HomeAway, I think that the monitoring question is much the same as it is here. So in HomeAway, the plaintiffs, the platform in that case, said, well, our website won't work if we don't allow these bookings. We can't have a website full of unbookable listings. And here, they don't have to change anything other than no longer entering into and continuing this financial relationship where they broker transactions for the app developers. Part of the activity of the publication doesn't have to change at all. They can continue to offer the apps in the app store. They can continue to put them up, post them, publish them. They can do all of that without processing, brokering, being involved at all in the transactions. And in fact, the other side of it is true, too. So you could imagine a scenario where they have — you know, the apps are hosted somewhere else. They're not on the app store. They're hosted by the developers themselves. But that wouldn't stop a third party, one of these defendants even, from brokering the transactions if they wanted to enter into that financial relationship. Let me ask you along the same vein, but just a little bit more concrete and specific. Sure. If you turn for a moment — I just got the Google complaint on my iPad. I just brought it up on my iPad, the Google complaint. If you go to count one of the complaint, you want to see the count one of the complaint? I've got the Apple one, but they're close. They're almost identical. So tell me — take what Judge Davila did and apply it specifically to count one, which is the unfair competition claim under California law. Sure. What would you have to prove under Judge Davila's in order to prevail? Sure. So count one is the unfair and unlawful business practices. It says that the, you know, these slot machines are unlawful, that they are illegal slot machines under California law. That's the first hurdle. Right. You'd have to prove that. Right. Okay. Next. And that, you know, we also have — or you prove that it's a lottery. There's a couple of ways that we can get it. But effectively, that it is unlawful conduct, which is one of the ways that you can state a UCL claim. And so, you know, the question is, well, are they, by being part of, by brokering the transactions for this illegal slot machine, which is either an illegal lottery or an illegal slot machine, are they engaging in unlawful conduct? And if they are, and the other requirements of the UCL are met, then we're entitled to the injunctive relief provided by the UCL. And that's neither — they're not involved in any publishing, quote unquote, as we've used the term in — I don't think that is a necessary requirement to demonstrate entitlement to relief under that statute. It's a statutory defense. Sure. They might say, well, no, you have to prove that. And we would say, well, no, we don't. Right? The fact that I just stated to you, brokering the illegal gambling transactions, meeting the other requirements, without getting into, you know, suffering an injury in fact, lost money or property as a result of the conduct in brokering the transactions, right, those would be enough. So what conduct specifically could they no longer engage in if this claim account was sustained? They've got to stop brokering gambling transactions, right? They have to stop being part of the financial transaction that is for illegal gambling. They just couldn't process the payment. Right. Or they can't take the payment. They can't — you know, they're acting as a middleman, as a broker, right? They get a request for a financial transaction. They process the credit card payment. They tell the app developer, you know, this payment has been processed for this amount of money and this amount of chips has been purchased. Right? You know, that kind of brokering activity, which is kind of part of one larger gambling transaction, you know, the chips are, you know, we allege that they're substantially all used for gambling and that they're gone in days. Assuming hypothetically we agreed, how do we know that's true for every single count alleged in this complaint? I don't think — I guess I have two answers to that. One is that in the way that they — the defendants moved to dismiss here, I don't think — I don't think the Court has to get there because the question is only kind of as a general matter by alleging this. You know, have we — have we established their affirmative defense? If the answer to that is no, then the motions to dismiss should be denied. But I think — I think perhaps what Your Honor is referring to is the question you were asking earlier, avoiding an advisory opinion and, you know, don't we have to get a real answer to go through all of these counts? You know, and I think we raised this concern at the — at the petition stage. And I guess — I guess what I would say to that is if district courts are going to continue to try to look at cases like this and knock out Section 230 first, then it may be useful to say, well, no, that's — you know, it doesn't — it doesn't have been established, you know, by way of this, you know, by just sort of referring to third-party content and saying, well, these depend on third-party content, therefore, you know, therefore you lose, you know. But I — otherwise, if the question is, well, should we send it back for further development or hold off or try to do the analysis ourselves, I think the answer to all of those questions is, well, no, that doesn't really make a lot of sense on this interlocutory appeal. I think then the answer would be, well, then this isn't a great case for an interlocutory appeal because it doesn't allow the court to do the analysis that's needed. And perhaps even the analysis that's needed isn't a pure legal question, but applying the settled law of this circuit to the particular facts of cases. Well, go ahead. Go ahead. If we dismiss these appeals and don't address the merits, what do you envision will happen next in the district court? You've got two MDLs and one class action, correct? I mean, they're all — they're all class actions, but yes. I would — I would imagine that the — that we would see attempts to dismiss the case on, you know, count by count. Would you move for leave to amend? If the appeal were simply dismissed? Correct. I don't think we'd need to if the district court — you know, if the district court asked us to. Well, then the alternative would — might you say, we think we're right on this, but alternatively, if we're not — Of course. Of course. If we got a motion to dismiss and it's that, you know, it was on state-specific claims, yes, certainly our motion — our response to the motion to dismiss would be, we think we state a claim, but if we don't, of course, then we'd ask to amend. So at the motion to dismiss stage, we take all the allegations — the well-pleaded allegations as true and ask whether or not there's — on these facts, is it reasonably plausible that you could prevail? You know, if there's a claim there. Right. And Mr. Boustro said, okay, yes, yes, yes. We assume that all the allegations are true. You assume there's gambling or whatever. But 130 — 230 bars all those claims. What's wrong? Why — I mean, why shouldn't we answer that question? I think that the Court certainly — I think the Court, as we could, it is possible to answer the question. I don't — you know, whether it is wise to do so on an interlocutory basis, you know, initially we said that that wasn't a good idea. Now there's been, you know, a year-and-a-half worth of delay, so, you know, it might not be so bad to have an answer on the question. You know, so I think, you know, whether the Court can answer that question depends on whether there's jurisdiction under Section 1292B, right? That is, whether — whether that particular question Your Honors just asked, whether it is actually a legal question that is open to, you know, that there's substantial disagreement on or reasonable, you know, minds could disagree on. And I think, you know, the district court didn't really identify any basis for that kind of disagreement, right? The district court said, well, on the facts of this, maybe, you know, a judge could have gone the other way. But the Court doesn't say, well, there's an unresolved legal question. I think that the legal question is pretty well answered, which is, well, is what we're accusing them of doing publishing, or is it not publishing? And, you know, this Horton Homeway, you know, a transaction to reserve vacation rentals is not publishing, even if it's bundled up together with publishing. There was some discussion about monitoring. But in that case, the platforms made the same argument the defendants made here. They said, well, we're going to have to monitor everything on this website in order to make it work. And the Court said, well, no, you might choose to in order to keep processing the transactions the way you'd like to do it. But you don't have to. That's a business decision. And the Court doesn't concern itself with whether someone might choose to engage in monitoring as a business decision, you know, as a result of potential, you know, liability for something that's not publishing. And at the end of the day, again, you know, like booking a rental house, gambling is not publishing. It is not what publishers do. Lemon, a similar argument, right? You know, in Lemon, the question was this, you know, a product feature that had been created that displayed a speedometer on someone's screen. Well, that's content. It didn't exist outside the app, right? It's content, content, content. But it didn't matter because the cause of action, what was ultimately, you know, the grounds for liability was product design. And so it didn't matter that, you know, what, you know, the product was an app and what was being used was an app. It's ultimately not a publishing cause of action. And then in Dairoff, you know, the question was not the way that it was framed previously. In that case, it was the functionality in question was recommending particular content, that is, curating content, deciding which, you know, the thing that they were being held liable for was, you know, whether or not particular content was being shown. And that is publishing, not, you know, a transaction for gambling. So you have a cross appeal. Yes. Did you want a challenge? Did you want to address any of Judge Davila's rulings on the two other theories that he rejected? The only reason that we brought the cross appeal was not to put us in the position where we're asking the court to affirm the district court's opinion on the other two theories and then wind up with law of the case that causes problems later on. And so I think, as I was saying earlier, you know, what we think is that really you shouldn't be dismissing legal theories on a Rule 12 motion, right? If one legal theory states a claim under Rule 8, well, then the correct outcome of the Rule 12 motion is denied. And, again, it's usually not an issue. We understand that, you know, a district court wants to signal to us which theories we should go forward on and which theories we shouldn't. Normally, it would be a formality. And the only problem is created by the interlocutory appeal, right? My concern was, well, we come up, it gets affirmed, we go back, we learn more facts. Maybe in discovery, maybe not in discovery. There's lots of other ways we can learn things, right? And we learn a new set of facts, and that opens up one of those other theories in a way that wasn't open before. And what we hear is, well, no, the Ninth Circuit already said that theory's out. And it just seemed — it seems strange to us to, you know, have that debate, potentially in the future in the district court, when we could simply just ask the panel here to make a decision on that question, and then it's answered either way and we know what to do. And that is, as I said, the only reason. If I understand your concern to be if you discover more facts, you could develop some of your claims, you seek leave to amend, and it's essentially denied because there's some kind of ruling that that theory is out of the case. And it's affirmed in the district court, perhaps of the opinion that, you know, it has been taken out of his hands. And yes, that's kind of the core concern. I will say, in order to come to the conclusion that the defendants set forth in their jurisdictional brief was that it's totally okay to dismiss theories and to affirm that. That would create a circuit split with the Seventh Circuit, a pretty clear one, I think, and a pretty unnecessary one. There's just no reason to go there. Counsel, that has somewhat triggered a question in my mind. To set this out for you, I can imagine that the clients in this setting are concerned about getting an answer at the least cost as quickly as possible. And they have a Ninth Circuit panel that they think is poised to make the decision and they're confident in their positions. But no one's really talking about the broader issue of why we're even concerned about the scope of interlocutory appeal here. It's a matter of allocation of power or allocation of authority, as between the district court and the court of appeals. It's a statute that's intended to avoid unnecessary burdens on the court of appeals. So would you address that? I mean, I think the arguments have all been parochial in the sense that it's all about my client. I suppose it should be. Their clients are paying the fees. But what's your position on what we would be doing to the jurisprudence if we do make a ruling in this setting on the merits? I think it creates serious problems, both in terms of the burden on the court of appeals and in terms of the delay on district court proceedings. Those are kind of the two major factors as to why interlocutory appeals are disfavored. The general rule of the federal judiciary hasn't changed. Right? We don't like interlocutory appeals. We don't like piecemeal appeals. They're generally bad. Narrow circumstances, we recognize, maybe they can be helpful. And, you know, our position from the beginning has been, well, this isn't really one of those cases. First, because of the delay. You know, the second time we were asked the question, the delay had already happened. So, you know, that's, you know, and I do think delay is generally not just bad for my clients, but bad for the administration of justice. You know, we want to keep the courts moving. And then in terms of allocation of resources, yeah, I think that is a serious concern, right? The court might come to a conclusion on the merits, and then we amend our complaint or the facts change or anything like that. And then, you know, what did we spend 18 months doing, and was this a good use of appellate resources? It really would be hard to say that it is. And so I think, you know, again, maybe it's a sunk cost fallacy, but I would certainly hope not to have wasted the briefing and the time that we've spent here. And so one way to resolve that, as we suggested in our jurisdictional brief, is, you know, the court could determine that there's no jurisdiction here, while at the same time saying, you know, using the opportunity to set out, okay, this, here is why this wasn't a good use of a 1292B, you know, process, and in that, you know, could also help us, you know. Whether 1292B is appropriate does, in part, depend on whether the question is disputed. And so, of course, the benefit for my clients is perhaps we could get a little bit of an answer on that point. The old, it's dicta, but it's Supreme Court dicta. Right, exactly. Well, I'm not sure that it would be dicta, actually, Your Honor, because one of the jurisdictional factors is, do we have a question on which there is a substantial disputed question of law? And so you're allowed to look into the merits to the extent that it's necessary to determine jurisdiction. And so, you know, that would be one way to do that. It certainly is a way that presumes that I win on a whole lot of issues. So perhaps, you know, I'm careful in suggesting that, but. I was just going to say, this Judge Davila made the decision to certify sua sponte on his own. Nobody suggested, there was nothing in the briefing in the district court that suggested, you know, you might, whatever you do, you might certify. It was sua sponte, and, you know, it followed some discussion that, you know, was, you know, at least questioned, you know, perhaps the extent to which Section 230 has been applied, you know, and echoed some of the concerns in, you know, that have come up in some other courts about, you know, how far out of the original intent of the statute and the language of the statute Section 230 has gotten. And so, you know, that, you know, perhaps there is pure question of law on that particular issue, you know, that has come up in, you know, even as high up as the set of questions is necessary to resolving this case. So perhaps this isn't the best time to resolve that.  Thank you. May it please the Court. Mark Perry for Apple, and on behalf of all the defendants. The Court has asked a number of questions about the interlocutory appeal, and if I could start with that. This is a statutory immunity. It prevents the lawsuit from proceeding if it applies. And immunities are typically taken first in litigation. And, in fact, in the District Court, the plaintiffs agreed to have the 230 immunity case decided first and in isolation. This Court has approved that methodology before. The roommates.com case, for example, assumed that the conduct pleaded violated the Even though, on remand, it turned out that there was no violation at all on the actual allegations of the complaint. That's how this case proceeded as well. Judge Davila did certify it sua sponte, I think recognizing that the District Courts could use guidance in this area. There are two cases, Coffey and Taylor, one Google, one Apple, that appear to conflict on the question whether processing of in-app currency payments is covered by 230. This Court has never directly ruled on that, although the Court has applied immunity in at least three cases to payment processing regimes, including, importantly, the second half of roommates.com, which included the premium pay-for content which the Court held was immune. So Judge Davila recognized the conflict among the circuits. In fact, the District Courts. In fact, there's a case in the Western District of Washington applying the Cater case that is being held pending this Court's decision in this case, I am told. And so it is important to the guidance of the District Courts. We also had Gonzalez. This case came up. The Supreme Court took Gonzalez. We all thought we were going to get some guidance. And the guidance we got was the Ninth Circuit gets to figure it out. So we're back here. And here we are. Judge Sung, you and others asked about the sort of claim-by-claim analysis as opposed to the holistic analysis. Again, this is a product of how it was briefed in the District Court. The plaintiffs never presented a claim-by-claim analysis. They presented the holistic analysis by theory. And there was a reason for that. The complaint is a host. It was your motion to dismiss. It was our motion to dismiss. In responding to our motion to dismiss, if you look at theirs, which in the Apple ER starts at ER 45, does not contain, you know, what one often sees as the claim-by-claim section. It just refers to them in gross. And there's a reason for that. This complaint is a hosting complaint. The word hosting or its cognates appears more than three dozen times in the complaint. But the plaintiffs, in response to the motion to dismiss, abandoned their hosting claims. And they only had what they called then a bookie claim. Bookie doesn't appear in the complaint. And what they call here a brokering claim. Brokering doesn't appear in the complaint. So they shifted their claims, and they didn't defend them on the way they were drafted in the complaint, but they didn't seek to amend either. Judge Paez, you asked about the UCL claim in particular, count one. Injury, of course, is an element of UCL claim. Injury, in fact, is an element of all of these state law claims. And the plaintiffs in this complaint chose to have a stand-alone section on injury. It's paragraphs 103 to 108 in the Apple complaint. And it's got the other two have the same thing. That section proves, establishes, that section 230 precludes all of these claims. Paragraph 104 in the Apple complaint says, these players have been injured by Apple's hosting, promoting, and facilitating of the apps. And 106 says, as long, and I'm quoting, by the way, as long as Apple continues to offer and promote the apps and continues to facilitate the sale of the chips, the harms will persist. Those are their injury allegations for all claims. Article III and statutory standing require injury. Hosting, promoting, and facilitating continue to offer and promote and facilitate the sale of chips. That is their case. We now know that hosting and promoting are immune. They've conceded it. Facilitating also is. And this is the bridge, if you will, Judge Sung, to the merits, unless the court would like to hear more on interlocutory appeal, because the whole case comes down to whether facilitating the sale of these virtual chips is also publishing content. Publishing is a business. Publishers sell books, newsletters, podcasts, games, and everything else for money. That's what publishing is. This is a monetization strategy. And Judge Sung, you asked my friend, what would the platforms have to do if the plaintiffs won? The response, and I wrote this down verbatim, stop processing gambling transactions. That was his answer. That shows 230 immunity for two independent but related reasons. First, the transaction is in content. Second, these virtual chips are third-party content. They are not created by the platforms. They are created by the developers. Processing a transaction in information created by another information content provider, to use this direct language of Section 230, is protected against state law regulation. That is all a virtual chip transaction is. Second, even if the underlying transaction is in content, the transaction is illegal? Well, that's the second answer. Thank you, Judge Paez. He put gambling into that sentence, right? Unlawful gambling transactions. In the context of an app on the Internet, how do we know? How does anyone know? The court, the defendants, the plaintiffs for that matter, know that a transaction is quote, unquote, unlawful. And it is only, only by examining the content of the app. Let's take the Double Down Casino, which is their poster child for this illegal slot, right? They say that 182 games within that app are slot machine games, that 21 of them are card games, and that, I don't remember, one or two of them are bingo games. There is no allegation that the card games or the bingo games are unlawful. So if a player, a user, a consumer were to download that app, which is content, and the downloading and the hosting are conceitedly protected, and then purchases a chip, which is content, which has nothing to do, by the way, with what goes on inside the game, so that's just a pure content transaction. That was my first answer. My friends say that it becomes unlawful if that player chooses to use that chip to put a spin on one of the slot games as opposed to a marker on a bingo game or a bet on a card game. Now, how do the platforms know what that user does with a chip? We don't right now. The only way we possibly could would be to monitor every in-app action by every user of every app on the platforms. For Apple, worldwide, that's well over a billion users and well over two million apps. It's an unimaginable number. Google and Meta, it's an equivalent number, right? Between the three platforms, it is a significant majority of the world population that this theory would require the platforms to go in and monitor every time somebody has a chip in their coin bank, wallet, piggy bank, whatever the app calls it, how they use it. Is it lawful or unlawful? And by the way, it gets worse because it may be, under the allegations, unlawful in Washington state but lawful in Florida. So the platforms would have to not only monitor each use of a virtual chip but where that user was located, which IP address it's running through. And it would go on and on from there. This is why monitoring here is not an optional aspect. And to come back to the stop processing transactions, my friends conceded in their brief that charging for a subscription is quintessential public activity. A chip is just a subscription. A chip is a per-spin subscription rather than a per-week or per-month subscription. And it has a direct analogy in real-world publishing. You can subscribe to a paper for a year or for a month or you can go down to the corner still, some corners, and plug a quarter into the machine and get one paper. And a token gets you one spin or ten tokens or whatever they've developed it. It is just a monetization structure that is content-dependent but it doesn't take it outside the realm of immunity because publishing activity includes all of these things. A related point on that, Your Honor, is that changing the content of the game, the developer has set it up to work this way with these virtual chips. Stopping that transaction changes the content of the game. That is an editorial function. That is a publishing function under every one of this court's cases. And the remedy that my friends stood at this lectern and told this court that they want would require that. Now, we talked a lot about HomeAway. I think my friends have already discussed it. The difference between the real world and content is immense. It's actually in the statute. Information provided by another information content provider. The chips meet that definition. The properties in Santa Monica do not. It is as simple as that. They are not information. They are properties. This is information through and through. And finally, I see my time is running out. My friends stood up and said we're talking here about policy preferences. Your Honor, Congress makes the policy. Section 230 includes several very specific exemptions, including for child sexual abuse material, including for payment processing for child sexual abuse material. That was the Doe v. Backpage case that the Congress effectively overruled by adopting that exemption. There is no gambling exemption. My friends on the other side are asking this court to do Congress's job and set up a new exemption to Section 230 because applying Section 230 as written requires dismissal of this complaint in its entirety. By the way, without amendment, there is no way this could be amended to get past 230 because it is content on top of content on top of content. Judge Bias. Yeah, let me ask you. So the certification order, when I first looked at it, I found it troubling because we're dealing with theories and not claims. And that, as counsel was saying a moment ago, you know, we're not fans of interlocutory appeals. I mean, it's disruptive to what goes on in the district court. Would it be out of question to simply ask Judge Davila whether he intended as a result of his order that all claims would be allowed to go forward? Your Honor, with respect, I think Judge Davila answered that question for us on page 36 of the motion of this misorder, which is at ER 38 of the Apple record. Quote, if the Ninth Circuit reverses this court as to plaintiff's second theory of liability, which is payment processing, which is all that's left, the case is resolved in its entirety. Right? So he understands that if this court recognizes that payment processing is content, is covered, then the case is resolved in its entirety. So he answered it that way. I would add a different or a related answer, Judge Pius, and this was really fleshed out in the Google brief, which is if we look at the actual complaint, and again I point you to paragraph 104 as a paradigm example, it says hosting, promoting, and facilitating. It's a three-legged stool. We now know that two of the legs are precluded. We now know they didn't amend their complaint. We now know that if the court were to simply stand on those allegations, that means the whole thing is bad. It doesn't mean some part of it is good. I think Judge Diavola got ñ was trying to triangulate it, including because of this court's then prevalent, you know, ruling in Gonzales. But the real answer is if a plaintiff pleads a clearly precluded complaint, then it is precluded. The claims are precluded because this was a hosting complaint through and through. And one of the artificialities before the court is that by focusing only on payment processing, it ignores that payment processing is actually one aspect of the much broader publishing relationship that the platforms have with the developers because it includes hosting. It includes updating. It includes reviewing. It includes promoting. It includes marketing. It includes access. It includes depublishing if they break the rules. It includes various monetization structures. And all of those things ought to be considered together. And if you consider them together, it's publishing. It's through and through. There is nothing other than third-party content involved here. So that I worry there's an artificiality there that Judge Diavola's approach wrote. But the answer then would be to recognize the whole thing is precluded. Rather, we would submit then to send it back. Thank you, Your Honor. Thank you, Counsel. Thank everyone for their helpful arguments today. This matter is submitted for decision. And with that, today's sitting is adjourned.
judges: PAEZ, SUNG, Fitzwater